ANDREW J. CUMMINS *vs.* EZEKIEL LITTLE and others.

1. The well settled doctrine of the court of equity is, that *mere inadequacy of price* affords no ground of relief, either against a private contract or a judicial sale.

2. But inadequacy of price may be so gross and unconscionable as to shock the conscience, and, in the case of a private contract, to amount to conclusive and decisive evidence of fraud; or, in the case of a judicial sale, to *constructive* fraud and abuse of trust.

3. *That* is a public and a proper place for setting up advertisements, contemplated by the act regulating sales of real estate, which is likely to give information to those interested, and who may probably become bidders at the sale.

4. The sheriff is bound to conduct the sale so as to protect the rights and promote the interests of all parties in interest, and to this end to secure, as far as practicable, the most general diffusion of the notice of sale.

5. The true test of a proper exercise of discretion by the sheriff in setting up notices is, whether he has set them up as a discreet man, desirous of effecting a sale of his property to the greatest advantage, would have done.

6. If a sheriff abuses, to the detriment of subsequent encumbrancers or of the defendant in execution, the discretion vested in him by law to make sale under execution, a court of equity will grant relief, although there has been a formal compliance in the conduct of the sale with all the requirements of the statute.

7. It is not necessary that there should be *actual* fraud, committed or meditated. The abuse of discretion in the execution of the trust is a *constructive* fraud, against which equity will relieve.

8. Where a sale by a public officer is conducted in violation of the spirit and policy of the law, and so as in fact to defeat the just claims of encumbrancers, or greatly to prejudice the rights of the defendant in execution, the sale will be set aside, though the formal requirements of the statute have been complied with.

*Depue*, for complainant.

1. We allege *fraud*, or gross negligence in conducting sale amounting to fraud; also fraud in keeping bidders from sale.

2. Accident or *surprise* in mode of advertising sale.

3. Sale void, because the property was not legally advertised. *Den* v. *Philhower*, 4 *Zab.* 796; *Philhower* v. *Todd*, 3 *Stockt.* 313.

Principles upon which equity interferes. *Seaman* v. *Riggins*, 1 *Green's Ch. R.* 214; *Skillman* v. *Holcomb*, 1 *Beas.* 131.

No distinction between those principles in law and equity. *Eberhard* v. *Gilchrist*, 3 *Stockt.* 166.

*Vanatta*, for defendants.

Complainant, if he recover at all, must recover upon case made by the bill. *Andrews* v. *Farnham*, 2 *Stockt.* 91; *Parsons* v. *Heston*, 3 *Stockt.* 155; *Day* v. *Lyon*, *Ibid.* 331; *Brantingham* v. *Brantingham*, 1 *Beas.* 160.

Insufficiency of consideration will not suffice to disturb sale. *Saxton* 3; *Ibid.* 55; 1 *Green's Ch. R.* 214; 2 *Ibid.* 214, 460; 3 *Halst. Ch. R.* 34; 3 *Stockt.* 167.

The court will not visit upon the purchaser the misconduct of the sheriff, unless purchaser be a participant in the fraud.

If a man takes a conveyance without search, there is no *surprise*. *Broom's Leg. Max.* 692–3; *Dart on Vendors* 406;

Vol. i.                    E

1·*Story's Eq. Jur.,* § 251; 4 *Johns. Ch. R.* 566; *Parkhurst* v. *Cory,* 3 *Stockt.* 233; *Skillman* v. *Holcomb,* 1 *Beas.* 131.

*Beasley,* in reply.

The policy of the court is to protect judicial sales. But it does not extend to encourage encumbrances. *Tripp* v. *Cook,* 26 *Wend.* 158.

Mr. Beasley further cited *Tiernan* v. *Wilson,* 6 *Johns. Ch. R.* 411; *Merwin* v. *Smith,* 1 *Green's Ch. R.* 182; *Williamson* v. *Dale,* 3 *Johns. Ch. R.* 290; *Collier* v. *Whipple,* 13 *Wend.* 226; *Howell* v. *Baker,* 4 *Johns. Ch. R.* 118; 2 *Phill. Ev.,* § 114; 1 *Greenl. Ev.,* § 115.

THE CHANCELLOR. The bill is filed to foreclose a mortgage from Little to the complainant, for $3249.33, bearing date on the twenty-first of November, 1859. The mortgage covers three tracts; one, a timber lot of thirty-nine acres; another, known as the saw mill tract, of one acre and forty-three hundredths; and the third, a farm of one hundred and sixty-five acres and thirty-six hundredths. The first two lots were of comparatively small value. The value of the farm was $9000. It was subject to three prior mortgages, amounting to $3870.34. On the fourth of November, 1861, the equity of redemption in the farm was sold by the sheriff to satisfy an execution at law, for $80.41, the amount of debt and costs due upon the execution. The judgment under which the property was sold was prior to the complainant's mortgage, and if the sale be valid his security is forfeited.

There is no material controversy as to the value of the property sold or the encumbrances upon it. The farm was worth at least $9000. The total amount of encumbrances, including interest to the day of sale, did not amount to $4800. The equity of redemption, which was sold by the sheriff, was worth over $4000. The purchaser came to the sale prepared to pay that price for it. It was arranged before hand among those interested in the purchase, that they would bid upon

Cummins *v.* Little.

the property enough to protect themselves and secure their debt. This could not be done except by satisfying the previous mortgage of the complainant. This property, which was worth $4000, and which the purchasers were prepared to take at that price, was struck off and sold for $80.41. Standing alone, independent of every other fact, ought such a sale to be sustained? The well settled doctrine of the court of equity is, that mere inadequacy of price affords no ground for relief, either as against a private contract or a judicial sale. The sound rule of public policy is, that biddings at judicial sales should be encouraged and that persons should not be deterred from bidding, even for purposes of speculation, by the apprehension that the sale will be set aside, because it was made below its full value. Property at a forced sale must frequently be sold greatly below its real value. Commercial revulsions, financial embarrassment, national distress, stringency in the money market, uncertainty about the title, and a variety of other causes, may depress the price of property far below its actual value. If mere inadequacy of price were a ground of relief, the principle would operate as a *stay* law. It would often happen that no valid sale could be made. If, therefore, the inadequacy of price be only such as is ordinarily experienced, or as may naturally be expected to result from the vicissitudes of human affairs, it affords no ground for the interposition of a court of equity. But there must be some relation between the price paid and the value obtained. It must be a sale, not a wanton sacrifice. It must be made in the exercise of a sound discretion, and in the due execution of a public trust; not an abuse of that discretion and a perversion of that trust. Mere inadequacy of price is no ground for relief, but fraud is: and the inadequacy of price may be so gross and unconscionable as to shock the conscience, and, in the case of a private contract, to amount to conclusive and decisive evidence of fraud; or in the case of a judicial sale, to constructive fraud and abuse of trust.

No judge or jurist has more inflexibly maintained or ably vindicated the familiar principle, that mere inadequacy of

price is no ground of relief against a judicial sale, than Chancellor Kent. Yet in a case where the sacrifice of property was much less than in the present instance, and the abuse of trust no more glaring, that eminent jurist said, "such a sale carries an abuse on the very face of it, and leads to the most oppressive speculation." *Tiernan* v. *Wilson*, 6 *Johns. Ch. R.* 413.

I have said thus much for the purpose of vindicating a familiar and well settled principle from perversion and misapplication, and in order to guard against any inference, that because this case is decided upon other grounds, the objection on the score of gross and unconscionable inadequacy of price is regarded as untenable. There are other grounds which admit of no question, upon which this case may be disposed of.

While mere inadequacy of price is not of itself a ground of relief, it is always a circumstance which quickens the diligence of the court in investigating the conduct of the officer, and calls into prompt and vigorous exercise its protecting agency against abuse of power.

The complainant's mortgage was the first encumbrance on the land sold, after the execution under which the sale was made. The effect of the sale was utterly to defeat that encumbrance, and to deprive the complainant of an unquestioned security for his debt. Was that result the consequence of the complainant's own laches? or did the course of the sheriff in conducting the sale naturally lead to the sacrifice of the property and the defeat of the complainant's rights? The complainant was not present at the sale; he had no notice of it. He testifies that he neither had notice of the time or place of sale, nor even of the existence of the judgment and execution. This, it is conceded, will not protect him, if he had the notice which the law contemplates, and the sale was in other respects conducted in accordance with the spirit and intent of the statute.

Was it properly advertised? The farm lies in Independence, the most eastern township in the county. It is

distant one mile and an half from Vienna; two miles from Hackettstown; three, from Danville; four, from Allamuchy; all villages in that township. The only advertisement in the township was at a store in Allamuchy, four miles distant, near the extreme eastern border of the county. One in the clerk's office at Belvidere, fourteen miles distant from the farm, and three in the village of Washington, twelve miles distant. There is nothing in the evidence to indicate that there were circumstances which rendered Allamuchy and Washington more appropriate places for putting up notices, than villages much nearer by, and to which the farmers of the vicinity would more naturally have resorted. Three notices were put up at Washington, as a mere matter of convenience to the officer who resided there. The most striking commentary upon the fitness of the selection is, that not more than one of all the witnesses examined who were interested in the sale, derived his knowledge of the sale from the sheriff's advertisement, or even saw the notices before the day of sale.

It is not alleged that the places selected for setting up these advertisements, was not a compliance with the letter of the statute. It was so: and it would have been equally a compliance with the letter of the statute, if, after putting up one notice within the township of Independence where the farm lies, the other four had been set up at unfrequented hotels or blacksmith shops in the most remote extremities of the county, where they were certain never to be seen by the parties interested or who were likely to become purchasers. The statute simply prescribes that the notices shall be set up at five public places. A public place is a relative term. What is a public place for one purpose, is not for another. A blacksmith shop in the country, or a tree at the intersection of public roads, would be a public place within the contemplation of the statute, if in the vicinity of the lands, but it would clearly be an abuse of discretion, thus to advertise town lots in a place twenty miles distant. That is a public and a proper place for setting up notices, which is

E *

likely to give information to those interested and who may probably become bidders at the sale. A great deal is necessarily and designedly left to the discretion of the officer. And when that discretion is fairly exercised, courts will not lightly interfere with its exercise. Still, courts will guard against its abuse. They will see that it shall not be so exercised as to strip an unfortunate debtor of his property or to defeat the just claims of an honest creditor. The sheriff in selling land, exercises an important public trust; and in effecting the sale, he is bound to conduct it so as to protect the rights and promote the interests of all the parties in interest, and to this end to secure, as far as practicable, the most general diffusion of the notice of sale. Would any discreet man, desirous of effecting a sale of this farm to the greatest advantage, have set up his notices as the sheriff did? That is the true test of the proper exercise of discretion by the sheriff.

But was the place of sale proper? The law prescribes no place of sale. It leaves it to the discretion of the sheriff. The general, if not universal custom in this state down to a recent period, was to sell real estate in the country upon the premises'or at the nearest and most convenient public house. That practice has fallen in great measure into disuse, and it is believed to be not unusual to sell lands at the county seat. There are obvious advantages in that practice. It affords facilities for resort to the records and to counsel, for settling questions respecting the title. And in some cases, especially where the property is convenient to the county seat or bidders most likely to be secured there, such course may be advisable. But would a sheriff be justified in advertising unimproved city lots of small value, the purchasers of which would be looked for among the operatives and mechanics and laborers of the city, to be sold at a place ten or twenty miles distant? Would any man of ordinary discretion adopt that course to effect an advantageous sale? Would it be a proper exercise of discretion in a sheriff, without some special cause, to adopt that course? And if the property was utterly sacrificed for want of purchasers, would the sheriff be justified

by the pretext that he was authorized by law to sell where he pleased?

It might be suggested that Washington, the place selected by the sheriff for setting up three of these notices, was a peculiarly appropriate place, both for setting up the advertisements and for making the sale, inasmuch as it was in the midst of a wealthy and prosperous agricultural community, where purchasers for valuable farms might be expected to be found. In point of fact, there was not a bidder from that vicinity. The explanation may be found in the character of the sheriff's advertisement. The property is there described as one lot of land and premises, situate in the township of Independence, containing one hundred and sixty acres, more or less, with the appurtenances. Who would conjecture that a valuable farm was to be sold under that advertisement? Such description in the immediate vicinity of the lands might have been understood. But what information did it convey to strangers? Was it an advertisement calculated to attract the notice of buyers, and to secure an advantageous sale? Is it a description that any sane man desirous of selling a farm, would have given of it?

But if the mode of advertisement and place of sale are open to exception, the manner of conducting the sale is still more so. The entire farm of one hundred and sixty-five acres, worth, as the evidence shows, from $9000 to $10,000, encumbered for less than half its value, is put up to satisfy a claim of $80.41, including debt, interest, costs and sheriff's fees. It cannot be doubted that any five acres of the land would have sold for enough to satisfy the demand. The fact that the whole farm was offered for sale to pay so paltry a sum, was in itself calculated to excite distrust. No honest purchaser would have bid with an expectation of buying. He must have believed, either that the property was encumbered, or that there was a defect of title, or the plaintiff being a sister of the defendant and the principal bidder his brother-in-law, that it was a mere formality by way of cover or of perfecting a title. Not only so, but the sheriff announces

to the bidders that if $80.41 are bid, he will strike the property off; if not, the sale will be adjourned. That was the instruction he had received from the attorney, and that is the mode in which the sheriff, in the exercise of his discretion, discharges his trust as a public officer. No course could have been adopted, more effectually to discourage competition and defeat a fair sale.

The property was cried for ten minutes, and was then struck off to the defendant, Daniel S. Ayres, who made, in reality, the only bid at the price which the sheriff had previously agreed to accept. There was a bid of $30, made by a person who was totally irresponsible. Other bids were made by two persons, who were concerned with Ayres in the purchase, and who, it is evident, were not bidding against him. The bids were all merely colorable, for the sheriff had previously announced that he would not sell under the amount due on his execution. As soon as that sum was bid, the property was struck off.

The whole conduct of the sheriff, in the advertisement and sale of the property, was a gross abuse of discretion. So far as the real design and purpose of the statute were concerned, it might as well have been sold at private sale. I accept it as a sound and clear principle, that if a sheriff abuses, to the detriment of subsequent encumbrances or of the defendant in execution, the discretion vested in him by law to make sale under execution, a court of equity will grant relief, although there has been a formal compliance in the conduct of the sale with all the requirements of the statute. It is not necessary that there should be actual fraud committed or meditated. The abuse of discretion in the execution of the trust is a constructive fraud, against which equity will relieve.

In arriving at this conclusion, no fraud or improper motive is designed to be imputed to the sheriff. The evidence does not warrant it. The fair presumption I think, from the evidence is, that the sheriff had no idea of the real value of the interest that he was selling, of the circumstances which

Cummins v. Little.

surrounded the transaction, or of the effect of the sale upon the rights of the parties interested. Otherwise, it is scarcely credible that, as a right minded man and upright public officer, he would have struck off the property as he did. Nor has any fraudulent motive thus far been imputed to the purchaser. If he attended the sale as he alleges, and purchased the property in good faith, without fraud or dissimulation, for the purpose of protecting his rights, it would not have justified the conduct of the sheriff or sanctioned the validity of the sale.

But there are circumstances in the case tending strongly to establish actual fraud in the conduct of the sale. It is clear that Little, the defendant in execution, intended to have been at the sale and to have purchased the property, or to have had it secured for his benefit. He originally employed another party to bid in the property for him. Arrangements for that purpose had been made. Finding that Ayres, his brother-in-law, who was a subsequent encumbrancer, intended to be at the sale to secure his own interest, he entered into negotiations with him, which continued up to the very day before the sale. What the precise character of those negotiations were is not clear. Nor is it material. It is perfectly certain that the defendant intended to be at the sale. His deep interest in the property rendered it certain he, or some one on his behalf, would be present. He left home at an early hour for that purpose. He arrived at the place of sale shortly after the property was struck off. He swears that he told the purchaser the day before, that he would be at the sale by half past one o'clock. Ayres admits that he expected Little to be at the sale. That expectation must have been derived from what passed between them the day previous. Ayres, with a full knowledge of this fact, tells the sheriff that whether he buys or not, depends upon how soon he sells, not upon the price bid. Why so? Unless he knew that Little was coming, and that he would either have his rights protected or the sale adjourned. It was the first day at which the property was advertised, and an adjourn-

ment would have been granted, if desired. The property is put up and cried for ten minutes, long enough to have sold a lot of rubbish or a broken down horse; a very spirited competition takes place between the purchaser and two others, for whom the purchaser was bidding and whose interests were the same as his, at prices which they knew the sheriff would not accept; the price named by the sheriff is bid, and thereupon, in the absence of the defendant in execution who arrived soon after, in the absence of a subsequent encumbrancer who was kept from the sale by information that it would not take place, a farm worth $9000, and the encumbered value of which exceeded $4000, was struck off for $80.41.

It appears to me, that in every aspect of this case the sale is one which equity will not tolerate. It was conducted in violation of the whole spirit and policy of the law, so as to defeat the just claims of the complainant, and greatly to prejudice the rights of the defendant in execution. The evidence justifies the belief, that one of the advertisements was not set up the length of time required by law, and that the title in the hands of the purchaser would be worthless upon that account. But this ground is not presented by the bill, and I deem it unnecessary to discuss the evidence upon that point or to lay any stress upon it.

The sale by the sheriff will be declared illegal and inoperative, the injunction restraining the delivery of the deed made perpetual, and the complainant's mortgage be decreed to be a valid and subsisting encumbrance upon the farm, to be paid in its due order and priority.